20034

E AND S INVESTMENT CORPORATION, Respondent, v. RICH-LAND BOWL, INC., and United Bowling Centers, Inc., Appellants

(216 S. E. (2d) 522)

*Clinch Heyward Belser, Esq.,* and *Jean Hoefer Toal, Esq.,* of *Belser, Baker, Belser, Barwick & Toal,* Columbia, *for Appellants,*

*Michael H. Quinn, Esq.,* of *Quinn & Faucette,* Columbia, *for Respondent,*

*Clinch Heyward Belser, Esq.,* and *Jean Hoefer Toal, Esq., of Belser, Baker, Belser, Barwick & Toal,* Columbia, *for Appellants,* in Reply.

June 12, 1975.

NESS, Justice:

This case involves the liability and measure of damages, if any, of the appellant Richland Bowl, the lessee, and United Bowling Centers, Inc., its guarantor, to respondent E & S Investment Company, the lessor. In 1961 the above mentioned parties entered into a twenty (20) year commercial lease of a large bowling center. Since that time the lease has been twice assigned to new tenants, each time with the consent of all parties. By the terms of the assignments the appellants remain liable in the event of default by the tenant. Under the second assignment Frank Wray & Association became the tenant and occupied the premises from 1965 to 1969. After continued arrearage in rental payments, Wray gave notice of his intent to terminate the lease and subsequently vacated the building.

Respondent now seeks damages from the appellants. After Wray's departure, the respondent sought to mitigate damages with some short term interim leasing. Later the respondent entered into a ten year lease with TG&Y Stores. The lease was signed on June 15, 1970, and occupancy began on November 26, 1970.

This case was referred to the Master who, after taking voluminous testimony made certain findings of fact which resulted in the liability of the appellants. The Circuit Judge approved these findings but disagreed as to the proper method of computing damages.

## Liability of the Appellants:

The apellants concede that under the terms of the lease they are both liable for damages unless excused by the actions of the respondent. In the lower court they have unsuccessfully advanced four arguments, each of which, they contend, should discharge them from liability. These same contentions are now cogently urged upon us.

First it is alleged that the respondent entered into a contract with Frank Wray which allowed Wray an extension of time for rental payments. This is an affirmative defense. Neither the Master nor the Circuit Judge made a finding in regard to the alleged contract. In their brief and at oral argument, the appellants concede that their position is bottomed on the exchange of letters between the officers of appellant and respondent corporation. A reading of letters does not support appellants' contention.[1] There was no binding contractual agreement to extend the time for payment.

Next it is asserted that the respondent permitted the tenants to commit delinquencies. This apparently refers to nonbinding accommodations whereby the respondent allowed the rent to be paid biweekly or weekly as opposed to monthly. These accommodations were made to assist in collecting the rent. Additionally, any complaint tendered by the appellants is resolved in favor of the respondent by an express term of the lease. It states in pertinent part: "The failure of landlord or of tenant to insist . . . upon the strict performance of any of the terms . . . shall not be construed as a waiver, or relinquishment, for the future of such terms, covenants and conditions." Accordingly, appellants' position is without merit.

The third contention is that upon default the appellants, as guarantors, offered to perform but that the respondent refused such offer. The Master found no

---

[1] Reprinting the letters would serve no useful purpose. The letter from respondent merely indicates that the tenant had paid the present month's rent, but was otherwise seriously delinquent. It also called upon United Bowling Centers, Inc., as guarantor, to satisfy the delinquencies.

offer had been made by appellants. This was concurred in by the Circuit Judge. When concurrent findings of fact are made in a case at law, the finding carries with it the same force as a jury verdict. *Diamond Swimming Pool Co., Inc. v. Broome,* 252 S. C. 379, 166 S. E. (2d) 308 (1969). There is abundant evidence upon which the finding may be supported.[2]

The final argument advanced is that the respondent ■ converted funds of its tenant (Wray) and that United Bowling Centers was entitled to these funds. Additional factual recitation is necessary to consider this matter. The respondent had been paid a security deposit of Thirty-five thousand Two hundred ($35,200.00) Dollars which was to be released at the rate of One hundred Forty-six and 66/100ths ($146.66) Dollars per month, so as to be totally repaid to the tenant at the conclusion of the twenty (20) year term. Hence, while the monthly installment was to be Two thousand Nine hundred Thirty-three and 33/100ths ($2,933.33) Dollars, the actual payment would be Two thousand Seven hundred Eighty-six and 67/100ths ($2,786.67) Dollars, credit being given the tenant for the security refund. At some point in time the tenant began making the full payment, without regard to the fact that it was entitled to credit itself with the incremental security release. This resulted in overpayment to the respondent.[3]

The appellants now attempt to escape liability charging that the respondent has converted *their* funds. First, the record does not indicate why they would have been entitled to the funds, but assuming a separate agreement between

---

[2] Mr. Wray testified that he attempted to get the appellants to assume the obligations under the terms of the lease but that they were not interested. Also, the president of respondent corporation stated that he sought the participation of the appellants by telephone and correspondence, which was introduced into evidence, but that the appellants made no offer to perform.

[3] Paragraph 26 of the lease agreement provides that the security deposit shall be applied $146.66 "each toward the payments of rent for each of the two hundred and forty (240) months of the lease term as each becomes payable."

Wray and the appellants, the actions of the respondent do not discharge the appellants. There was no unhonored demand made upon the respondent for recoupment of overpayment. When the respondent is cleansed of the descriptive epithets urged by the appellants, it is no more than an involuntary bailee.[4] This contention of appellants would seem to be controlled by *Mack Manufacturing Company v. Massachusetts Bonding & Insurance Company,* 114 S. C. 207, 103 S. E. 499 (1920) in which a surety sought a discharge due to overpayment by its principal and retention by the plaintiff. In the absence of prejudice, the defense was unavailing.[5]

Based on the above discussion, we affirm the order of the lower court as it relates to the liability of the appellants.

## Damages

The measure of damages is most complex. We deem it best not to dwell at length with the treatment of this issue by the Master and Circuit Judge. The conclusions of each are reprinted in tabulation form in an appendix to this opinion.

Both the Master and the Circut Judge awarded damages for past due rent, loss of rent prior to the re-renting, taxes, insurance and miscellaneous expenses. The propriety of these awards is unchallenged. The Master did not award any damages beyond July 31, 1970, apparently because the lease for the replacement tenant was executed on June 15, 1970. The Master determined that this lease was more valuable than the old lease. His finding was exclusively predicated upon expert testimony which compared the value of the leases based on the financial strengths of the respective tenants and the prospects for the type of business undertaken.

---

[4] The Circuit Judge observed, "I do not believe there was an intentional misappropriation of these funds . . ." (tr., p. 83).

[5] The appellants have been awarded an offset in the amount of the overpayment and this has not been contested by the respondent.

The Circuit Judge properly overruled the Master.[6] The lease itself provides for the measure of damages stating the tenant "shall be (liable for) the difference between the amount the Tenant herein contracts to pay and the amount which Landlord may be able to *realize* from the re-renting of the premises to other parties . . ." (Emphasis added) (Paragraph 15 of the Lease Agreement). Obviously, the lease does not contemplate such a comparative investment analysis approach as used by the Master for the calculation of damages.

The Circuit Judge attempted to compute damages based on projected rental incomes from each lease. The old lease called for annual rental payments of Thirty-five thousand Two hundred ($35,200.00) Dollars and the replacement lease for Thirty-six thousand Ninety-one and 30/100ths ($36,091.30) Dollars.[7] These figures would indicate that the respondent suffered no damages from future rentals; however, it encountered expenses of Forty-nine thousand Two hundred ($49,200.00) Dollars remodeling the premises. Remodeling was a condition of the replacement lease and the necessity of incurring remodeling expenses in order to mitigate damages is unchallenged. It is this expense which has caused great difficulty in computing damages. The replacement lease obligates the respondent to pay for the first Fifty thousand ($50,000.00) Dollars of remodeling. The respondent and the replacement tenant agreed that this may be figured as a return on investment at the rate of thirteen percent (13%) per annum. This would amount to Sixty-five

---

[6] The replacement lease in addition to a fixed rental would compute rent on the basis of a percentage of total sales if that would result in a larger amount. In the absence of testimony the value of the replacement lease calculated on the percentage formula would be speculative and therefore improper. The only testimony relating to the percentage formula of any value is that of an expert witness, indicating that in general such provisions usually generate income within a five year period. This is of insufficient probative force for us to consider the percentage feature in comparing the rent realized under the two leases.

[7] Actually the gross rental under the replacement lease was $42,542.88; however, it is conceded that differing obligations dealing with property taxes, insurance and otherwise reduce the fair comparative value to that stated in the text.

hundred ($6,500.00) Dollars so the Circuit Judge sub-tracted that amount from the rental income of the TG&Y lease.[8] Loss of future rental income was figured to be Thrity-nine thousand Eight hundred Forty-four and 05/100ths ($39,844.05) Dollars. We think this was error.

The amount of the rent realized under the TG&Y lease is not to be gauged by an agreement between the respondent and TG&Y, not consented to by ap-pellants, concerning the return of capital for remodeling expenses. Damages are to be the difference between the rent under the old lease and the amount realized under the new lease. The crucial word is *realize*. We must place a construc-tion upon it as is reasonable, considering the damage clause of the lease in its entirety. *Bruce v. Blalock,* 241 S. C. 155, 127 S. E. (2d) 439 (1962); *Charleston & Western Caro-lina Railway Co. v. Joyce,* 231 S. C. 493, 99 S. E. (2d) 187 (1957). We have not been cited to any authority interpret-ing this word and our own research has revealed that the cases that have are of little assistance.[9]

Under the terms of the old lease, the appellants were obligated to maintain the interior of the building and to make repairs and replacements of equal qual-ity when necessary. This condition is important when arriv-ing at the effective loss of rent, that is, the rent not realized by releasing. It follows that in computing damages the re-spondent can deduct from the rental income under the TG&Y lease all costs of remodeling, which he incurred, but only to the extent that those expenses will not be attribut-able to appreciation in the building beyond June 1, 1981, (the date of expiration of the lease with appellants) which is in excess of the value of the building had the appellants complied with their lease. Perhaps the practical affect of this

[8] Apparently the Circuit Judge based the Sixty-five hundred ($6,-500.00) Dollars on a thirteen (13%) per cent return on Fifty thousand ($50,000.00) Dollars rather than Forty-nine thousand Two hundred ($49,200.00) Dollars, the actual expense incurred.

[9] The cases deal almost exclusively with construing the Internal Reve-nue Code.

is to allow an offset for permanent appreciation resulting from the remodeling; however, we have carefully phrased the test because some increased value from the repairs may extend beyond 1981, yet not be permanent in the more traditional sense of that word.

Because of the view the Master took as to the value of the TG&Y lease, he did not make specific findings as to the scope or nature of the remodeling. He did state that some of it was of a permanent character and that it would result in substantial continuing benefit to the respondent. Therefore, it is necessary for us to remand this case for further consideration consistent with this opinion.

Another element of damages awarded by the trial judge is revival of a Seven thousand Eight hundred ($7,800.00) Dollars debt of the appellants previously forgiven by the respondent. The debt was conditionally discharged; the condition being that if Richland Bowl were required to resume payments, the debt would be revived. Upon the default of Frank Wray, Richland Bowl was called upon to perform under the lease. This involved payment of rents. The Circuit Judge found the appellants liable for the debt and we agree.

Finally, the Circuit Judge awarded interest on the appellants' past due debts. The propriety of this is not contested; however, appellants urge that, in essence, they be awarded interest on their security deposit. Since interest is based on statute, contract, debts from an account stated or a liquidated debt, their position is without merit. The respondent was entitled to the security deposit by the terms of the lease. Had the parties intended that interest accrue, such a provision should have been incorporated into the lease. See, *e. g. Robert E. Lee & Company, Inc. v. Commission of Public Works,* 248 S. C. 92, 149 S. E. (2d) 59 (1966); *Freeman v. King Pontiac Company,* 236 S. C. 335, 114 S. E. (2d) 478 (1960).

In view of the complicated nature of the damage awards, the following is furnished as a statement of damages through November 26, 1970.

## STATEMENT OF DAMAGES

Rental loss through June 30, 1969 (when Frank Wray vacated the premises) ................... $ 9,090.06

Rental due from July 1, 1969, to November 26, 1970, the day TG&Y began rental payments figured at the rate of $2933.33 per month) ................. 49,475.50

Taxes:

    1968 .................... 2,124.48

    1969 .................... 2,699.01

    1970 through November 26 .. 2,445.12

Insurance:

    1968 .................... 1,259.00

    1969 .................... 1,277.00

    1970 through November 26 .. 1,156.40

Revival of Debt .............. 7,800.00

Clean Up Yard ............... 29.40

Miscellaneous ................ 79.26

Utilities ..................... 104.82

Termite Treatment ............ 96.00

                                        $77,636.05   $77,636.05

Allowable Credits:

    Security Deposit Balance on hand July 1, 1969 ........ $21,047.31

    Sum received from interim renting from July 1, 1969 to July 31, 1970 ........... 2,130.65

Payments to respondent not
credited to rentals ....... 3,519.84

$26,697.80  $26,697.80

Total damages through November
26, 1970 ............................$50,938.25

Interest to be computed at the legal rate on the balance owed at the end of each month beginning with the sum of $3,-810.04, the amount owed on February 18, 1969.

The final disposition of this case will be subject to adjustment of this figure so as to include whatever damages, if any, result from the loss of rent for the remainder of the lease sued upon.

Affirmed in part; reversed in part and remanded.

Moss, C. J., and LEWIS and LITTLEJOHN, JJ., concur.

BUSSEY, J., concurs and dissents.

APPENDIX A

Master's Recommendation for
Damage Award:

Damages Recoverable by Plaintiff
against Defendants:

1969—Rental loss occasioned by
sublessee Wray's arrearages $9,090.06

Rental loss from July 1, 1969,
through July 31, 1970 ........ 38,133.29

1968—Richland County Real
Estate Taxes (paid in
1969) ................. 2,124.48

1968—Liability & Fire
Insurance .............. 1,259.00

Previous Contract Debt ........ 7,840.00

| | |
|---|---:|
| 1969—Richland County Real Estate Taxes | 2,699.01 |
| 1969—Liability & Fire Insurance | 1,277.00 |
| Clean Up Yard | 29.40 |
| Miscellaneous Repairs | 79.26 |
| Utilities | 104.82 |
| Termite Treatment | 96.00 |

$62,732.32

Credits Allowable to Defendants As set off Against Amounts Due Plaintiff:

Security Deposit Balance ........ $21,047.31

Sums received from Frank Wray and improperly retained by Plaintiff ..................... 3,519.84

Net Rental received from Wm. Sauls for reletting subsequent to breach and prior to permanent reletting .................... 2,130.65

$26,697.80

Balance Due to Plaintiff .................. $36,034.52

## APPENDIX B

Circuit Judge's Damage Award:

Rental Loss through June 30, 1969 $ 9,090.06

Rental Loss for the following
  periods:

| | | |
|---|---|---|
| July 2, 1969— December 31, 1970 | 47,432.96* | |
| January 1, 1971—May 1, 1974 | 18,662.30 | |
| 1968 Taxes | 2,124.48 | |
| 1968 Insurance Premium | 1,259.00 | |
| 1969 Taxes | 2,699.01 | |
| 1969 Insurance Premium | 1,277.00 | |
| 1970 Taxes | 2,699.01 | |
| 1970 Insurance Premium | 1,277.00 | |
| Revival of Debt | 7,840.00 | |
| Clean Up Yard | 29.40 | |
| Miscellaneous | 79.26 | |
| Utilities | 104.82 | |
| Termite Treatment | 96.00 | |
| | $94,670.30 | $94,670.30 |

Credits Allowable to Defendants:

| | | |
|---|---|---|
| Security Deposit Balance | $21,047.31 | |
| Sums received by Plaintiff but not credited to rentals | 3,519.84 | |
| | $24,567.15 | $24,567.15 |

Balance due Plaintiff as Present
  Damages .............................$70,103.15
Future damages
  (Subject to $39,844.05 to reduction to present value)

*The Circuit Judge credited the respondent with the interim short term renting income in arriving at this figure.

Interest recoverable at the rate of 6% on arrearage being on February 18, 1969, and continuing to be computed on a monthly basis an arrearage owed at the end of each month up to November 25, 1970. Thereafter, interest at the same rate shall be computed on an annual basis for loss sustained under the replacement lease as computed by the Circuit Judge in an earlier part of his order.

BUSSEY, Justice (concurring and dissenting) :

Being of the view that there was no prejudicial error I would affirm the judgment below in its entirety. At the outset I am not convinced that the issue, upon which the majority opinion would reverse in part, is before us by any proper exception, in accordance with the rule or embraced in the stated question argued by appellants which simply challenges the right of the respondent to any future damages contending that the new lease was more valuable than the old one.

Assuming, however, that the issue is properly before us the judgment below should be affirmed upon what I think are elementary principles of law. This is a law case wherein a finding of fact by the circuit judge is binding upon us if supported by any competent evidence. Both the master and the circuit judge found, as a fact, that the actual gross rent being paid by TG&Y under its lease for the premises leased under the old lease was the sum of $36,042.88. It is true that the lease called for an annual rental payment of $42,-542.88, but both the master and the circuit judge found as a fact, deduced from the evidence, that the sum of $6,500.00 included therein was not rent, but arose out of the agreement between the lessor and the lessee for a return of 13% on improvements of the value of $50,000.00 added, or to be added, by the lessor to meet the need of the lessee. $49,-200.00 was actually expended with $800.00 held in reserve for minor contingencies. Both the master and the circuit judge concluded, apparently as a matter of fact and law, that the $6,500.00 annual return based on the improvements

made for TG&Y was irrelevant to the controversy between the parties here. The evidence in the record abundantly supports their factual findings.

It is, of course, true that the agreement between the respondent and TG&Y is not binding upon the appellants as they were not parties thereto, but as to any matter with which the appellants were not concerned respondent and TG&Y had the right to make any contract which they were minded to make. There is nothing to suggest that the improvement agreement between the respondent and TG&Y was in any way unreasonable or prejudicial to the rights of the appellants. Even if the $6,500.00 annual payment which arose out of the improvements be regarded as rent, such would be rental realized from the improvements and not rental realized from the same premises which were under the former lease. So, in any view of the matter, in the absence of any showing of fraud upon or overreaching of the appellants, I agree with the master and the circuit judge that the $6,500.00 annual payment has no relation whatever to the controversy before us.

The evidence shows that in order to minimize the damages occasioned by Richland Bowl's breach of its lease, respondent, at considerable effort and expense, finally obtained another tenant who was willing to pay as gross rental, for the premises as they stood, the sum of $36,042.88 per annum. The new lessee, however, desired improvements and alterations to suit the property to its needs to the extent of $50,000.00. The parties agreed that the respondent would make such expenditure and that a reasonable return on such would be 13% per annum and that accordingly the lessee would add to the rent that it agreed to pay the sum of $6,-500.00 per annum. There is certainly nothing unreasonable about a 13% annual return on improvements which may or may not be of some value to a lessor at the end of a leasehold.

There were other factors or differences in the two leases which had to be adjusted in order to arrive at what was

in fact the difference between the rent being realized under the old lease and that being realized under the new lease. After making adjustment for all of these varying factors the circuit court found, as a fact, that the net rental being realized under the new lease was $5,598.70 less than that being realized under the old lease. Such finding of fact was fully supported by the evidence and His Honor's calculation of the damages incurred after the property was taken over by TG&Y is based upon such finding of fact as to the differential in the net rental actually being realized.

The majority opinion, in my view, simply rejects findings of fact by the lower court, which are fully supported by the evidence, and substitutes in lieu thereof for solution of the difficulty between the parties a formula, which to say the least, is quite difficult of application, which would of necessity involve considerable guess work as to future events, circumstances and conditions and which most importantly allows the respondent no adequate return, if any, by way of interest, rent or otherwise over a ten year period, on the sum of $50,000.00 which the respondent was compelled to expend in order to obtain a new lessee and minimize the damages caused by the breach of the former lessee.